Argued May 17, affirmed July 18, 1950

# McLEAN *v.* STATE INDUSTRIAL ACCIDENT COMMISSION

221 P. (2d) 566

*Ray H. Lafky,* Assistant Attorney General, of Salem, argued the cause for appellant. With him on the brief were George Neuner, Attorney General, and T. Walter Gillard and Roy K. Terry, Assistant Attorneys General, all of Salem.

*C. S. Emmons,* of Albany, argued the cause for respondent. On the brief were Willis, Kyle & Emmons, of Albany.

Before Lusk, Chief Justice, and Brand, Belt, Rossman, Hay, and Latourette, Justices.

BRAND, J.

The plaintiff brings this action under the Workmen's Compensation Act, seeking recovery on account of the accidental injury to her husband, arising out of and in the course of his employment, and resulting in his death. Plaintiff's husband, John N. McLean, met his death by electrocution while engaged in work at Camp Adair, a former army camp, and in that portion of the camp which was being operated by the Oregon National Guard under a revocable license from the War Department. The workman was not a member

of the National Guard. The plaintiff sues for the benefit of herself and four minor children, the fruit of the marriage. The military department of the State of Oregon is a duly organized department of that state and is authorized by law to employ workmen and to carry out its various functions. Within the time provided by law, the plaintiff filed with the State Industrial Accident Commission a claim for compensation and furnished the required proofs of marriage and births of the children. The defendant denied plaintiff's claim for compensation under the Workmen's Compensation Act and within the required time plaintiff filed a petition for rehearing which, after hearing by the Commission, was denied, and the former order rejecting plaintiff's claim was affirmed. The plaintiff then filed a complaint in the circuit court under the provisions of statute. The facts set forth in plaintiff's petition for rehearing were substantially realleged in her complaint.

In addition to the allegations of the complaint which were admitted and which we have summarized in the statement of fact, the complaint alleged:

## "III.

"That on or about the 30th day of March, 1949, and for some months prior thereto John Noel McLean was employed by the Military Department of the State of Oregon as a maintenance helper and caretaker of property controlled by and alloted to the State of Oregon in the Camp Adair United States Military Reservation in Benton County, Oregon. That as a regular part of his duties in his employment John Noel McLean worked upon and assisted in the maintenance, repair and servicing and operation of the electric power plant, electric power lines and electricity distribution system generally in said camp, and that he was also at said

time and place regularly employed in building repair, maintenance and construction and in the operation of power-driven machinery in a workshop maintained upon the premises by the said Military Department, and that the said John Noel McLean in his employment with the Military Department as aforesaid was engaged in a hazardous occupation within the meaning of the Workmen's Compensation Law of the State of Oregon.

## "IV.

"That on or about the 30th day of March, 1949, the said John Noel McLean under the specific direction of his immediate supervisor and while working in the course of his employment climbed a power pole with electric lines and a switch attached thereto, and in some manner by accident came in contact with high tension lines and received an electrical shock which threw him to the ground, and that as a proximate result of said shock and subsequent fall he died within a very short time."

The quoted allegations are denied by the answer. After trial of the issues, the jury returned a special verdict as follows:

"QUESTION: Did John Noel McLean meet his death as a result of an injury by accident arising out of and in the course of his employment with the Military Department of the State of Oregon at Camp Adair, Oregon, in a hazardous occupation on the 30th day of March, 1949?"

"ANSWER: *Yes* \* \* \*"

The plaintiff had judgment in accordance with the verdict.

The issues which are presented here were raised by motion for nonsuit and for directed verdict and for judgment, notwithstanding the verdict, or in the alternative, for a new trial. The motions were all

denied by the court. The motions sufficiently raised the issues which are presented by the assignments of error.

■ By the fourth assignment the defendant asserts that the court erred in denying appellant's motions in that the deceased workman was an employee of the United States government. He will assume that by this assignment the defendant means to assert that there is no substantial evidence in the record that the workman was an employee of the military department of the State of Oregon as alleged in the complaint. The answer admits that the workman at the time of his injury and death "was on the payroll of the Military Department of the State of Oregon as a maintenance helper and property caretaker". Brigadier General Raymond F. Olson, one of the two commanding generals of the Oregon National Guard, who was familiar with the details by which the National Guard took over Camp Adair from the War Department, testified that the military department of the State of Oregon applied to the War Department for 300 acres of Camp Adair and that a revocable license was issued under which the National Guard took over that area and agreed to turn the buildings back to the War Department in the same condition in which they were received, less ordinary wear and tear. "The use of all buildings within a certain described area including the utility service thereon, water mains, electrical distribution system, things of that nature" were turned over to the military department of the state. He testified further:

"Q. As I understand from the testimony introduced here, you had a maintenance crew? A. That is right.

"Q. What instructions, if any, were given to

this maintenance crew? A. Well. their instructions were, of course, naturally the protection of the property involved from a fire angle, from theft, breaking windows and the necessary minor maintenance that they give attention to on the job themselves. Any major repair work they are supposed to notify our office and we write to the War Department through the National Guard's jurisdiction and get funds to make the repairs.''

Again he testified:

''Q. You have complete charge and control of that area and equipment and buildings there until you turn it back to the War Department? A. Don't say 'We' the Military Department.

''Q. And you have control and care of it and responsibility for it? A. Yes.''

General Olson testified that Mr. Clack, who was the unit caretaker and range maintenance man, and who supervised the deceased workman, was paid by the federal government, but he added, ''Mr. McLean was a State employee paid entirely from the State.'' The Adjutant General of Oregon was authorized by federal statute to perform such duties as may be described by the laws of the state, U. S. C. A., Title 32, § 11. He issued instructions to Mr. Clack concerning work to be done at Camp Adair. The Adjutant General is an appointee of the Governor of Oregon. We are cited to section 42 of Title 32, U. S. C. A. as amended in 1947. That section authorizes the appointment of civilians as caretakers and provides that the secretary of the army shall fix the salaries of all caretakers ''and shall also designate by whom they shall be employed''. That provision does not, as a matter of law, render a person in a position of the deceased workman, an employee of the United States, nor does that result follow from the fact that the state may be reimbursed in part for

wages paid by it to the workman. Upon the record made in this case, we hold that there is substantial evidence supporting the allegation of the complaint and the verdict of the jury to the effect that the workman was employed by the military department of the State of Oregon.

By its first three assignments the defendant asserts that the court erred in denying the motions for nonsuit and for directed verdict and for judgment non obstante. These assignments of error present the contention that the evidence fails to show that the deceased was employed in any of the three hazardous occupations specified in the quoted portions of the statute and in which he was allegedly employed. Relevant provisions of the statutes are as follows:

"If an employer is engaged in any of the occupations defined by this act as hazardous, the workmen employed by him in such occupations are deemed to be employed in a hazardous occupation but not otherwise. The hazardous occupations to which this act is applicable are as follows:

"(a) When power-driven machinery is used, the operation of * * * workshops;

" * * *

"(e) The construction, repair, alteration * * * of buildings * * * or other structures;

"(f) The operation of * * * electric light or power plants or lines * * *". O. C. L. A., § 102-1725.

"All persons, firms and corporations engaged as employers in any of the hazardous occupations hereafter specified shall be subject to the provisions of this act * * *. Where an employer is engaged in a hazardous occupation as hereinafter defined, and is also engaged in another separate occupation or other separate occupations not so defined as hazardous, he shall not be subject to this act as to such

separate nonhazardous occupations, nor shall his workmen wholly engaged in such separate nonhazardous occupations be subject thereto except by an election as authorized by section 102-1716. Employers who are engaged in an occupation partly hazardous and partly nonhazardous shall come within the terms of this act the same as if said occupation were wholly hazardous. * * * It is the purpose of this act that an occupation and all work incidental thereto and all workmen engaged therein shall be wholly subject to or wholly outside the provisions of this act." O. C. L. A., § 102-1712.

"If an employer is subject to this act as to any occupation, all workmen employed by him in such occupation shall be subject to this act as workmen, but not otherwise." O. C. L. A., § 102-1728.

"Every workman subject to this act while employed by an employer subject to this act who, while so employed, sustains personal injury * * * by accident arising out of and in the course of his employment and resulting in his disability, or the beneficiaries, as hereinafter defined, of such workman, in case the injury results in death, shall be entitled to receive from the industrial accident fund thereby created the sum or sums hereinafter specified * * *". O. C. L. A., § 102-1752 as amended by Laws 1947, Ch. 61.

"The term 'employer', used in this act, shall be taken to mean any person, including receiver, administrator, executor or trustee, who shall contract for and secure the right to direct and control the services of any person * * *". O. C. L. A., § 102-1703.

If we determine that the state or its military department is an "employer" within the meaning of O. C. L. A., §§ 102-1703, 102-1712, 102-1728 and 102-1752, then, it will be our duty to determine whether any part of the occupation of the military department at

Camp Adair included any of the activities specified in the complaint and defined as hazardous in paragraphs (a), (e) or (f) of O. C. L. A., § 102-1725. It is to the latter question that the parties have devoted a large part of their briefs. However, we must first determine a basic question on which the entire case depends: Is the State of Oregon or its military department subject to the Act as an "employer", and are its employees covered by the Act when it engages in the occupations specified in the complaint and defined as hazardous in paragraphs (a), (e) or (f) of O. C. L. A., § 102-1725? The plaintiff relies especially upon the following statutory provision:

"If the state or any state department, county, incorporated city or town, school district, irrigation district, or political subdivision of the state or any county shall engage as an employer in any hazardous occupation as defined in this act, it shall not have the right to reject the provisions and benefits of this act; provided, however, that this section shall not apply to ports or port commissions nor to cities having a population of more than 100,000." O. C. L. A., § 102-1714.

We now return to the provision of O. C. L. A., § 102-1725, a portion of which we have quoted supra. That section enumerates the occupations which are defined as hazardous. Subparagraphs (a) to (g) inclusive enumerate occupations which are hazardous, if an "employer" is engaged therein. Subparagraph (h) adopts a different procedure. It enumerates "services performed by" persons, peace officers, etc., working for the state or some of its instrumentalities. We quote:

" * * * *

"(h) The services performed by:

(1) Salaried peace officers and firemen of the

state, counties and municipal corporations of the state;

(2) Special or temporary peace officers who are appointed and paid by the state or any political subdivision thereof for such special or temporary service as peace officers;

(3) County surveyors and their deputies and assistants engaged in field work; and

(4) Employes of the state or any political subdivision thereof engaged in the operation of bridges solely within the state.

The state, counties and municipal corporations shall be deemed employers under the terms of this act and shall pay to the accident fund the payments required of employers by this act. If any municipal corporation has provided by municipal ordinance or by its charter for the compensation of peace officers or firemen injured in the course of their employment, such officers or firemen shall not be entitled to the benefits of this act." O. C. L. A., § 102-1725.

The defendant commission argues that the State of Oregon is not within the intent and scope of the Workmen's Compensation Law *as an employer*. Concerning subparagraph (h) of O. C. L. A., § 102-1725, defendant concedes that by itself that portion of the statute "would seem to be a definition of the state and counties as employers" but defendant asserts that in view of its legislative history the provision in the last portion of (h) to the effect that "the state, counties and municipal corporations shall be deemed employers under the terms of this act" relates only to "the services performed by" peace officers, surveyors, firemen and bridge employees.

The defendant draws attention to the provisions of O. C. L. A., § 102-1716 and to the amendment of that

section in 1947, both of which read, so far as this question is concerned, as follows:

" * * * any municipal corporation or the state or any political subdivision thereof engaged in a hazardous occupation *not otherwise subject* to this act * * *".

may elect to contribute to the accident fund and thereafter "The employer and his workmen * * * shall be subject to all of the provisions of this act * * *".

Defendant says with some reason "it is thus clearly contemplated in the law that there may be hazardous occupations to which the state or state departments are not automatically subject". The substance of defendant's contention is that under well recognized rules of construction the State of Oregon and its instrumentalities do not come within the purview of the words "any person". See O. C. L. A., § 102-1703, supra. It is argued in substance that, although all of the occupations specified in O. C. L. A., § 102-1725 including those enumerated under (h) are made hazardous, the history of the legislation shows that an occupation is not brought under the Act unless it is (1) defined as hazardous, and (2) engaged in by an "employer" as defined in the Act. Lastly, it is argued that the various session laws show that the legislature intended the state and its instrumentalities to be deemed "employers" only as to the services performed by police officers and others enumerated. There is substance to these contentions. Turning back to O. C. L. A., § 102-1714, we observe that the language employed is purely negative; the state "shall not have the right to reject". It might be said that if the legislature intended to provide that the state should be subject to the Act as to all activities defined as hazardous, apt language was

available, but none was availed of. The same section provides that if the state engages *"as an employer"* it shall not have the right to reject the Act. We are constrained to reject the contention of the defendant, however, on the ground that this court has squarely announced a contrary doctrine. In *King v. Union Oil Company,* 144 Or. 655, 24 P. 2d 345, 25 P. 2d 1055, the plaintiff, an injured workman brought an action for damages based on negligence against the Oil Company. The workman was a water boy working on a road crew employed by the county in constructing a market road. At that time, though the law has since been changed, the section O. C. 1930, 49-1815, defining hazardous occupations, after the usual enumeration, added the words "and all occupations for which rates are expressly established by section 49-1825". The last-named section expressly established a rate for "road making". It was held that the action against the Oil Company would not lie because plaintiff's case was covered by the Compensation Act. The court said:

> "The work in which the county was then engaged is one of the hazardous occupations enumerated in the Workmen's Compensation Act, and counties, when engaged in such work, are required by the act to contribute to the industrial accident fund to the same extent and in the same manner as are other employers when engaged in such work. See sections 49-1815 and 49-1825, Oregon Code 1930. * * * "

The King case was decided in 1933. Since that time there have been eight regular sessions of the legislature, at each of which the Workmen's Compensation Act has been overhauled, but no change has been made in the provisions of O. C. L. A., § 102-1714 which was construed and applied in the King case. We have reason

to assume that the administrative construction of the Act by the Commission has been in harmony with the decision of the court, notwithstanding the contention of counsel for that Commission.

In the recent case of Stuhr v. State Industrial Accident Commission, 186 Or. 629, 208 P. 2d 450, this court cited the King case with approval, though the ruling pursuant thereto was perhaps not necessary to the decision. The construction of the Act as it applies to the state is not free from doubt. We apprehend that the practice of the Commission might be seriously disrupted if the construction placed on the Act by the King case were now rejected. The legislature will soon be in session and will have the opportunity to clarify the Act if the judicial construction of 1933 does not express the present legislative intent.

■ Construing O. C. L. A., § 102-1714 and O.C.L.A., § 102-1725, supra, as legislative declarations that the state is to be deemed an employer as to all of the hazardous occupations enumerated in subparagraphs (a) to (h) inclusive, and therefore subject to the Act, we turn to the first three assignments of error and will consider whether in the case at bar, there is any substantial evidence that the employer was engaging in a hazardous occupation. Under O. C. L. A., § 102-1712, if the military department was engaged in an occupation partly hazardous and partly nonhazardous, then it is under the terms of the Act "as if said occupation were wholly hazardous".

■ In *Bennett v. State Industrial Accident Commission*, 113 Or. 627, 233 P. 537, the employer was operating a sawmill. The employee was injured while engaged in moving a donkey-engine to the mill. The

operation of the sawmill was admittedly a hazardous occupation. The plaintiff recovered. The court said:

"It seems to us that if plaintiff's employer was, at the time of plaintiff's injury, engaged in operating his mill and at the same time in the movement of an engine to the mill for logging purposes, it was all a part of one occupation and not two different or separate occupations. This being so, it renders unnecessary the consideration of the question raised by the Attorney General as to whether, in itself, the movement of the engine was a part of a logging operation or was an occupation defined as hazardous under the statute, since the operation of a sawmill is, under the statute, a hazardous occupation."

See also *Union Oil Co. of California v. Hunt,* 111 F. 2d 269. The word "occupation" as used in the statute, cannot be interpreted to mean "the business in which one is principally engaged" as indicated in *Childers v. Brown,* 81 Or. 1, 158 P. 166. In that case this court was construing the statute which exempts from execution a team "necessary to enable any person to carry on the trade, occupation or profession by which such person habitually earns his living * * *". The section with which we are now concerned, of necessity, implies that an employer may have two or more occupations which may be carried on, either separately or together. In dealing with the many activities of the state or of its military department, we take judicial notice that it may have many separate occupations, some of them wholly nonhazardous. The evidence presented in this case tends to show that the administration of the Camp Adair project was a separate occupation. Our decision does not therefore affect all of the activities of the military department as would be the case if we construed the word "occupation" as inclusive of all of the activities of the department.

As we have shown, the military department assumed the obligation to carry on such maintenance and repairs as would be necessary in order to return the property to the War Department in the same condition in which the property was received, less ordinary wear and tear. Concerning the carpenter shop which was maintained and operated at the camp, the witness Clack testified as follows:

"A. Well, it is a regulation army carpenter shop, the building is probably 25 by 60 feet, it is equipped with three jointers, table saw, a bench saw, band saw and a drill press and a little wood lathe.

"Q. Now, those different articles or pieces of machinery that you have just mentioned, are those all driven by electric power? A. Yes.

"Q. What's the size of some of the motors? A. They vary from half horse to 7½ horsepower.

"Q. And did you and Mr. McLean use that carpenter shop and those tools during the 17 months before he was killed? A. Yes, on occasion.

"Q. What work did you and Mr. McLean do that caused you to utilize the facilities of that shop? A. We used the shop to make minor repairs, repairs to buildings cut necessary boards. We did build a cabinet for the office of the Military Department too.

"Q. Now, supposing you needed to put some siding, what kind of siding did those buildings have on them? A. They have several different kinds, it varies from 6 inch tongue and groove to 12 inch rustic lath.

"Q. If you had to cut some of that, or especially on the angle or certain number of lengths of it, would you take it over there and cut it? A. Possibly, yes.

"Q. Do you recall whether you ever had to cut siding? A. No, I don't believe we did. It could be done.

"Q. Supposing some small boys come along and knock out some windows and window frames and you would put them back? A. Yes, we have some sash.

"Q. In other words, you were set up there for whatever work had to be done, you had the stuff to do it with? A. Yes.

"Q. And you did use it? A. Yes, we did.

"Q. Would you be able to say whether you men had a designated time that you went over and done carpenter work or shop work or did you just do it when you needed to? A. We did it as occasion asked, there wasn't any required time, no.

"Q. And was that a regular part of your duties to do that? A. We considered it that."

The plaintiff testified concerning her husband's work as follows: "Well, he greased trucks and he build cabinets in the carpenter shop and they repaired on high lines, put back missing wires. Well, they kept the firing range clean and repaired minor repairs like windows." His work was diversified and every day he had a different job. His duties as utility man were "general maintenance and repair". The over-all work that the men did at the camp was "just general repair work, necessary repairs, minor repairs most". The installations at the camp included a shop for the repair of vehicles as well as a carpenter shop. In this shop an electric pump and electric air compressor were used. There were federal vehicles at the camp which had been turned over to the state for their use and maintenance. The witness Clack testified:

"A. We didn't do a large per cent of the work in the carpenter shop. That would be just an estimate, perhaps ten per cent or less.

"Q. But you did work there? A. Yes.

"Q. And you might any day have your work, you might spend some time around using that power run machinery? A. Yes.

"Q. Depending upon the need? A. That is right."

He also testified:

"There was always some repair to buildings that are on the rifle range. There may have been occasion for him to go into the carpenter shop to make some alterations."

He further testified that they replaced locks, rehung doors and made minor roof repairs. Under instructions from the headquarters of the National Guard the witness Clack and the deceased workman built in the carpenter shop a mailing cabinet, a pigeonhole cabinet for various addressed envelopes, on which they worked at odd times for about a week. The cabinet was delivered to the Salem office of the military department.

■ As provided in O. C. L. A., § 102-1725 (e), the repair of buildings is defined as a hazardous occupation. There is substantial evidence that the occupation of the military department at Camp Adair included repair of buildings and that such repair was a part of the regular duties of the injured workman. As in *Bennett v. State Industrial Accident Commission,* supra, we find that the military department at Camp Adair was engaged in one occupation, and not two different or separate occupations. It was engaged in maintenance and repair of buildings. It thus becomes unnecessary to consider whether the activities of the military department at the camp, other than repair of buildings, were hazardous within the definitions of the statute. The employer being in an occupation partly hazardous is brought within the terms of the statute "the same as if said

occupation were wholly hazardous'' and the workman engaged in the occupation and in all work incidental thereto was subject to the provisions of the Act. We find it unnecessary to decide, therefore, whether the carpenter shop operated by the employer was a workshop within the meaning of the somewhat ambiguous definition thereof, which is found in the statute O. C. L. A., § 102-1702, nor is it necessary to consider the extraordinary contention that the throwing of a switch on a power line constitutes the operation of power plants or lines within the terms of O. C. L. A., § 102-1725. We hold that the injured workman was employed by an ''employer'' in an occupation partly hazardous. The employer and his workmen in that occupation at Camp Adair were under the Act.

Defendant's fifth contention is that employment by the National Guard is excluded from the Workmen's Compensation Act. In support of this position it is said that a separate system of compensation is provided by Oregon law for personnel of the National Guard. The workman was not a member of the National Guard. He was a civilian employee of the military department. O. C. L. A., § 103-285, to which reference is made, provides for relief to injured officers or enlisted men of the National Guard. It has no application here.

█ It is next contended that O. C. L. A., §§ 102-1714 and 102-1715 are void ''their titles being in violation of Article IV, Sec. 22 of the Constitution***''. The sections, the validity of which is challenged, first appear as a part of Chapter 326 of the Laws of 1927, under a title which reads as follows:

> ''To amend chapter I, title XXXVII, Oregon Laws, the same being the workmen's compensation law, by adding thereto a new section to be known as

section 6614-1, relating to the rejection of the workmen's compensation law by the state and political subdivisions thereof; to amend section 6636, Oregon Laws, as amended by section 6, chapter 133, General Laws of Oregon, 1925, and to provide for the termination or rejection of the workmen's compensation law by the state and political subdivisions thereof as to hazardous occupations, and to amend section 6617, Oregon Laws, as amended by section 1, chapter 40, General Laws of Oregon, 1925.''

That chapter amends the original Workmen's Compensation Act of 1913, as amended. The title to Chapter 112 of the Laws of 1913 reads as follows:

''Creating the State Industrial Accident Commission and providing an Industrial Accident Fund, making an appropriation for such fund and providing for the administration of the terms of this Act, providing for the collection and disbursement of funds for the benefit, compensation and care of workmen, prescribing the duties of employers and workmen subject to this Act, and providing penalties for a violation of the terms of this Act, and abolishing in certain cases the defenses of assumption of risk, contributory negligence and the negligence of a fellow servant in actions for personal injury and death.''

The title does not refer to ''persons, firms and corporations'' but to the duties of employers and workmen subject to the Act. We think that it was competent for the legislature under this title to declare who shall be deemed employers and what their duties under the Act shall be. The original Act has been amended with reference to the duties or rights of various governmental bodies, as employers, by nearly every legislative session from 1917 to 1949. In many instances the amendments referred only to the right to elect to come under the Act; in others, mandatory duties were im-

posed. We are not disposed at this late date to invalidate all of the legislation of the past thirty years which has dealt with the rights and duties of the state and its instrumentalities under the Act, in view of our plain duty to give a liberal construction to remedial statutes of this character. *Stuhr v. State Industrial Accident Commission,* supra. We hold that the amendments were germane to the subject expressed in the title to the original Act.

■■■■ Defendant's seventh contention is that O. C. L. A., §§ 102-1714 and 102-1715 are violative of the 14th amendment to the Constitution of the United States, and of section 20, Article I of the Constitution of Oregon. This argument is based on a false premise. Defendant assumes correctly that the National Guard is a department of the state and that the sovereign immunity from suit applies. It then assumes that the Compensation Commission would be compelled to pay the claim in the case at bar out of funds contributed by private employers without any right to sue the state for reimbursement. If the legislature has placed the state or its military department under the Act, then by the same token it has imposed upon the state the duty to contribute and to pay to the accident fund the payments required of employers by the Act. O. C. L. A., § 102-1725. This court must presume that the state will take such action as will not impose on private employers, burdens which are not rightly theirs.

■■ Lastly, the defendant contends that "if the work was hazardous, the workman was performing an illegal act and therefore was not in the course of his employment." The evidence shows that the deceased workman was not a licensed electrician. So it is claimed that if he performed services in the operation of a

power plant or line he was doing an illegal act. The throwing of a switch for the purpose of turning on the electricity is not operating a power plant or line regardless of whether the switch be at the back door of a private residence or on a power pole. Nor was the act of turning the switch one which required a license under the provisions of O. C. L. A., § 112-612 or any other section of the chapter requiring licenses for electrical workers. The evidence shows that the workman could have used a "hot stick" six feet long with which to throw the switch, but preferred to climb the pole into close proximity to the high power wires. In throwing the switch he was performing a duty expressly imposed upon him and was within the course of his employment when killed.

The judgment of the circuit court is affirmed.